UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FRANKLIN M. GOLDMAN,               )
          Petitioner                      )
                             )
    v.                                     )   Civil No. 04-CV-12712-MLW
                             )
DAVID L. WINN, WARDEN,             )
UNITED STATES OF AMERICA,          )
          Respondents

**Petitioner Franklin Goldman's Trial Brief**

I.      **Introduction**.

      The evidence to be presented at the hearing will establish, by at least clear and convincing evidence, that Franklin Goldman is actually innocent of the 1974 kidnapping of Jeffrey Lopes, and all related charges, which served as the predicate for a career offender sentence imposed in the matter of United States v. Franklin Goldman, Criminal No. 92-10229-AMD, and is therefore actually innocent of being a career offender. Thus, for all of the reasons articulated herein, as well as those reasons articulated in prior memoranda filed in this case and incorporated herein, Mr. Goldman's sentence in Criminal No. 92-10229-AMD should be vacated, and he should be re-sentenced to 121-151 months, his guideline sentence without consideration of the vacated conviction. [1]

II.     **Factual and Procedural Background**.

     On April 27, 1993, as a result of a finding that he was a "career offender" pursuant to §4B1.1 of the United States Sentencing Guidelines, Franklin Goldman was sentenced to

---

[1] The Petitioner

serve 360 months incarceration. One of the predicate convictions for the career offender status was a conviction in the Bristol Superior Court, on or about August 5, 1977, for the alleged kidnapping of Jeffrey Lopes from the Stadium Café and alleged attempt to extort money from Mr. Lopes. (PSR at ¶69).

The 1977 Bristol County conviction that served as the career offender predicate resulted from a jury-waived trial before the Honorable Vincent R. Brogna ("Judge Brogna", herein); attorney Jack I. Zalkind represented Mr. Goldman. Mr. Goldman's co-defendants were Francis Larkin and Robert Mondello.  On or about August 5, 1977, Judge Brogna found Mr. Goldman guilty of attempted extortion and kidnapping, and not guilty of committing the armed robbery. Judge Brogna sentenced Mr. Goldman to M.C.I. Walpole for a term of not more than (10) years nor less than five (5) years, and ordered said sentence to be served concurrently with a twenty-five (25) to forty (40) year sentence Mr. Goldman was serving at the time of this trial in the Bristol County matter.

On or about August 12, 1977, Mr. Goldman filed (*pro se*) a notice of appeal. On September 28, 1977, Mr. Goldman filed (*pro se*) three pleadings: (1) a motion for free transcripts, (2) a petition for Writ of Habeas Corpus ad Testificandum, and (3) a motion for appointment of counsel. On October 19, 1977, without a hearing and by letter to the clerk, Judge Brogna denied all three pleadings, stating, among other things, that Mr. Goldman's attorney of record had not been allowed to withdraw and said attorney had not requested transcripts and he "consider[ed] the claim of appeal to be completely frivolous." On November 1, 1977, approximately three weeks after denying Mr. Goldman's motions, Judge Brogna allowed attorney Jack I. Zalkind's motion to withdraw as counsel.

On or about April 14, 2000, Mr. Goldman filed a motion for new trial with respect to the Bristol County convictions, arguing therein that "the ineffective assistance of predecessor counsel and judicial error [] deprived the Defendant of his guaranteed right to appeal the criminal convictions" entered in that matter. The motion for new trial was heard by the Honorable Daniel F. Toomey, Associate Justice of the Superior Court ("Judge Toomey" and/or "motion judge", herein).  On July 5, 2001, a hearing was held with respect to the motion for new trial. Ultimately, in addressing "the vexing question of the remedy, if any, for the defendant's faultless loss of his right to appellate review of his conviction", Judge Toomey held that "justice may not have been done" and "a new trial is an appropriate, and perhaps only, way to insure that the interests of justice—the defendant's personal interest <u>and</u> the Commonwealth's institutional interest—are realized." (Ruling at 4). In said ruling, dated October 15, 2001, Judge Toomey found that "justice may not have been done" because, through no fault of his own and contrary to his wishes expressed consistently since the time of this conviction (August 5, 1977), [Mr. Goldman] cannot be afforded the appellate review to which he was, and is, entitled." "This conclusion is compelled", Judge Toomey wrote, "by the reality that defendant's desire to test the legitimacy of his conviction is not a recent contrivance, driven, as are many these days, by the hope that records have been lost, memories have failed, and the evidence has been eroded by the passage of time. Rather, defendant sought, *ab initio*, to subject his conviction to the appellate scrutiny to which the law entitled him. He timely filed a notice of appeal; he timely sought appellate counsel; he timely sought sentence appeal; he timely sought revocation and revision. Each effort was blocked by the trial judge."

Judge Toomey also expressed "concern that 'justice may not have been done' because trial defense counsel, in omitting to pursue the appeal desired by defendant, may have grounded his inaction on inappropriate considerations." Judge Toomey wrote that as "expressed in both his 1999 affidavit and his 1993 letter to defendant, trial defense counsel recollected that he regarded an appeal to be unwarranted because defendant's sentences were concurrent with a much lengthier sentence then being served." Judge Toomey found that "defense counsel does not appear to have included, in his calculus as to the advisability of an appeal, the substantive merit of such an appeal." Additionally, Judge Toomey wrote that defense counsel's "subsequent withdrawal as counsel for defendant demonstrates that, despite defendant's patent interest in pursuing an appellate challenge to the trial proceedings—as demonstrated by the *pro se* claim of appeal, *pro se* motion for free transcript, *pro se* motion for the appointment of counsel, *pro se* motion to revoke and revise and *pro se* claim of sentence appeal—trial defense counsel was plainly disinclined to assist defendant in obtaining the review defendant repeatedly sought." "Accordingly," Judge Toomey found, defense counsel's "post-trial advice to defendant, which focused upon the impracticality of an appeal rather than on its viability as a device to challenge the trial doings, was consistent with his indisposition to an appellate effort."

On or about December 23, 2004, the Petitioner filed the instant petition, pursuant to 28 U.S.C. §2241, to vacate the sentence imposed in Criminal No. 92-10229-AMD, arguing that a miscarriage of justice has occurred because "the Petitioner is both innocent of the predicate Bristol County state court conviction (a position he has maintained since trial of the state court matter in 1977) and is innocent of being a career offender (the predicate conviction has been vacated due to the unlawful deprivation of the Petitioner's

statutory right to appeal and his constitutional right to the effective assistance of counsel on appeal)."  Franklin Goldman's §2241 Petition and Incorporated Memorandum of Law, at 1.

III.    **A Summary of the Anticipated Evidence**.

Through testimonial and documentary evidence, the Petitioner will sustain his burden of proving by clear and convincing evidence that no reasonable juror could have found beyond a reasonable doubt that Mr. Goldman committed the charged state offenses.  In particular, the Petitioner expects to establish that the culpable participants in the Bristol County matter were Ralph DeLeo, Francis Larkin, and Robert Mondello, as well as an attorney named Harvey Brower.  As for witnesses, the following individuals have potentially relevant testimony: (1) Ralph DeLeo, (2) Franklin Goldman, (3) Frank O'Boy, (4) Jack Zalkind, (5) Jay Groob, and (6) Robert Mondello.  As for documentary evidence, the Petitioner has offered or will offer: (1) two police reports detailing the investigation of responding officers in or about November 1974, (2) the relevant docket entries of the Bristol County matter, (3) Judge Toomey's decision on the Petitioner's motion for new trial, (4) death certificates or other materials establishing the death of Francis Larkin, Jeffrey Lopes, Harvey Brower, Robert Davenport (an employee of Budweiser who testified at the Petitioner's state trial), and Robert Buch (a second Budweiser employee who testified at Petitioner's state trial), (5) case summaries regarding a federal conviction and other materials establishing misconduct of Harvey Brower, and (6) case summaries and other documents regarding the misconduct of Judge Brogna, including but not limited to the public censure of Judge Brogna for misconduct.

The Petitioner expects the evidence to establish, *inter alia*, the following:

- The alleged kidnapping was a staged event in which Mr. Lopes willingly participated, the goal of which was to extract a sum of money from Mr. Lopes' father, a known bookmaker and criminal. The evidence will show that Mr. Lopes was "taken" on the day in question by Ralph DeLeo, Francis Larkin and Robert Mondello, and that Attorney Harvey Brower also participated in the planning and/or execution of the staged kidnapping.

- The Petitioner expects the evidence to show that Mr. Goldman is actually innocent of the charged state crimes, and that he was working at Budweiser at the time of the alleged offense.

- The plan apparently went awry when Mr. Lopes' father refused to give Jeffrey Lopes any money and told him to call the police.

- According to the police reports, Mr. Lopes told the authorities that at approximately 7:15 a.m., on November 24, 1975, Mr. Lopes arrived at the Stadium Café on Coggeshall Street in New Bedford, Massachusetts. As he arrived, he saw three men trying the front door. The three men left in a grey Pontiac motor vehicle. The police later determined that this vehicle had been rented by Francis Larkin from Kevin Delaney Pontiac on Morrissey Boulevard, Dorchester, Massachusetts.

- Mr. Lopes left the Stadium Café for a period of time, returning at approximately 11:30 a.m.. Around noon, two men came into the Café, asked to speak with Mr. Lopes, and they went into a back room. Mr. Lopes told the police that, in the backroom of the Café, one of the two men showed Mr. Lopes a .38 caliber revolver and told him to come with them. Mr. Lopes told the police that they left the Café in a yellow, 2 door Ford Torino, which was being driven by a third "kidnapper." Police officials later determined that this vehicle was rented by Robert Mondello from the Econo Car of 205 Bremen Street, East Boston.

- Mr. Lopes told the police that the four men drove to a near-by gas station, at which time the two men from the Café and Mr. Lopes entered the Pontiac Catalina, while the driver of the yellow Ford Torino left the scene.

- Mr. Lopes told the police that at some point during the day, Mr. Lopes and the others exited the Ford and entered a small 4 door station wagon. Police later determined that this vehicle was a 1974 Green Station Wagon, AMC Hornet, and was owned by Robert Mondello.

- This vehicle ended up breaking down on Route 24, at which time a Massachusetts State Trooper arrived at the scene and helped them push the car to the side of the highway.

- At that point, the men walked to the Carlton House in Brockton, Massachusetts, sat down in the lounge, and Mr. Lopes had a Chivas Regal on the rocks. At first, the men were provided access to a banquet room, and then later another room.

- Later in the afternoon, Mr. Lopes was dropped off at a mall.

- Between the time he was dropped off at the mall and 4:00 p.m. the next day, Mr. Lopes had visited his father in jail, who told Mr. Lopes to contact the police, which he did.

- The next day, Mr. Lopes was contacted at approximately 4:00 p.m., ostensibly to facilitate an exchange of money. Arrangements were ultimately made for Mr. Lopes to drop a bag of money near an office trailer in a shopping complex on Route 44 in Taunton, Massachusetts. Mr. Lopes had already contacted law enforcement authorities and was "cooperating" with their investigation.

- Law enforcement officers eventually observed and chased two men in the area of the "drop." These two men jumped over a fence and landed in Grossman's lumber yard, eventually disappearing. These two individuals were Ralph DeLeo and Robert Mondello.

- The officers maintained surveillance and observed a white car stop near the location of the trailer. Mr. Lopes identified the individual who exited the car as one of the two men who entered the Stadium Café to retrieve him. This individual was arrested—it was Francis Larkin. Officers found a .38 caliber revolver, a paper bag and rolls of tape inside the vehicle, which was a white Ford Torino, Registration Number 388-566. The police later determined that this vehicle was rented by Robert Mondello from the Econo Car of 205 Bremen Street, East Boston—it was rented on November 25, 1974 (the day after the alleged kidnapping).

- An inquiry of Econo Car by law enforcement officers on November 26, 1975, revealed that Robert Mondello had rented various vehicles on several different dates:
  - The white Ford Torino in which Mr. Larkin was arrested was rented by Mr. Mondello on November 25, 1975.
  - On November 22, 1975, Mr. Mondello rented an Elite Ford Torino, which was returned November 23, 1975, ostensibly because it was not operating properly.
  - On November 23, 1975, Mr. Mondello rented another yellow Ford Torino, registration No. 474-937, which he returned on November 25, 1975 (the day after the alleged kidnapping). This vehicle had 329 miles on it when returned by Mr. Mondello.

- Law enforcement officers also learned that workers at Econo Car retrieved a blanket and pillow from the trunk of the yellow Ford Torino returned by Mr. Mondello on November 25, 1975.

- There were numerous identifications made by witnesses in this case, but no individuals identified Goldman as being present in the Stadium Café or the Carlton Lounge. The only persons that identified Goldman were certain repair shop workers, who identified Mr. Goldman as one of two men who requested repairs to the station wagon disabled on Route 24.

- The identifications made in this case were as follows:

  - Claudio Dragon, who was in the Stadium Café in the morning when the men tried to enter the first time and around noon when the 2 men entered the Café, selected photographs of Mr. Larkin and Mr. Mondello as the 2 men who entered the Café.

- o George Fernandes, who was working the bar on November 24, 1975, identified Robert Mondello as one of the 2 men who entered the Café.
- o Jeffrey Lopes identified Mr. Larkin as one of the 2 men who entered the bar.
- o Jody Lopes, sister of Jeffrey Lopes, who was working behind the bar on November 24, 1975, identified Francis Larkin as being one of the 2 men who left with Jeffrey Lopes.
- o Three workers at Econo Car selected photos of Mr. Mondello.
- o A worker from the Pontiac dealership that rented the vehicle to Mr. Larkin identified Mr. Larkin.
- o Ronald Terfry, owner of Ronnie's Sunoco of 827 Belmont Street, Brockton, identified Frank Goldman as the person who handed him the key to the station wagon and requested that he tow the vehicle from Route 24.
- o Steven LeBlanc, a worker at O'Brian Bros. Garage, located in Brockton, which ended up towing the vehicle at the request of the Massachusetts State Police, identified Goldman as the individual who came into the garage on November 25, 1975 and instructed him to make certain repairs to the station wagon. Richard Leedberg of O'Brian Bros. Garage also identified Goldman as the person who came into the garage on November 25, 1975.

- Based on the identifications of Goldman by the garage personnel, officers obtained a warrant to search 569 North Main Street, Randolph, Massachusetts, the residence owned by Mr. Goldman's mother, and were authorized to seize a .38 caliber revolver, a white and yellow stocking cap, brown leather jacket, tan sheepskin jacket, make-up paraphernalia to wit: false nose, powders used in the commission of the crime of kidnapping and armed robbery.  Officers found none of the items listed, other than generic make-up that belonged to Mr. Goldman's mother.
- The evidence will show Mr. Goldman is actually and factually innocent of the alleged kidnapping and any related offense, and that his only involvement was to respond to a request by Mr. Mondello to make arrangements to have Mr. Mondello's station wagon towed from Route 24.

IV.    **Petitioner need not establish cause or prejudice because he has asserted his actual innocence**.[2]

The government has argued that Goldman's claim is barred because he cannot

satisfy the standards of "cause and prejudice."  This misplaced argument is premised on

---

[2] The Court has inquired regarding the issue of "cause and prejudice."  The Petitioner includes several sections on this topic for the Court's consideration as a supplement to the prior pleadings submitted on this issue.

"the general rule that claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice." <u>Massaro v. United States</u>, 538 U.S. 500, 504, 123 S.Ct. 1690, 1693 (2003), <u>citing</u> <u>United States v. Frady</u>, 456 U.S. 152, 167-168, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); <u>Bousley v. United States</u>, 523 U.S. 614, 621-622, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). "The procedural-default rule is neither a statutory nor a constitutional requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments." <u>Massaro</u>, 538 U.S. at 504.

Goldman need not establish cause and prejudice because where, as here, an individual claims actual innocence, he is excused from satisfying the "cause and prejudice" standards.[3] <u>See</u> <u>Murray v. Carrier</u>, 477 U.S. 478, 495-96, 106 S.Ct. 2639 (holding that "'[i]n appropriate cases,' the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration); <u>Schlup v. Delo</u>, 513 U.S. 298, 321 (1995) (noting that in <u>Carrier</u> the Court held that "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."); <u>Kuhlmann v. Wilson</u>, 477 U.S. 436 (1986); <u>Bousley v. United States</u>, 523 U.S. 614, 622, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1997) (holding that "[w]here a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate *either* 'cause' and actual 'prejudice,' or that he is 'actually innocent,'") (emphasis added).

---

[3] For reasons discussed *infra*, see §VI, Goldman can satisfy "cause and prejudice" in this case, although it is not required in this case.

A cogent, helpful analysis of the actual innocence exception to the cause and prejudice standard is contained in Schlup v. Delo, 513 U.S. 298 (1995), wherein Schlup claimed actual innocence of a murder for which he was to be executed. Some procedural background is helpful. On January 5, 1989, after exhausting his state collateral remedies, Schlup filed a *pro se* petition for a federal writ of habeas corpus, asserting the claim, among others, that his trial counsel was ineffective for failing to interview and to call witnesses who could establish Schlup's innocence. Schlup, 513 U.S. at 306. The District Court concluded that Schlup's ineffectiveness claim was procedurally barred (Schlup failed to raise the claim on appeal), and it denied relief on that claim without conducting an evidentiary hearing. Schlup, 513 U.S. at 306. The Court of Appeals affirmed, though it did not rely on the alleged procedural bar, but instead conducted an examination of the record and found that trial counsel's performance had not been constitutionally ineffective. Schlup, 513 U.S. at 306.

On March 11, 1992, represented by new counsel, Schlup filed a second federal habeas corpus petition, wherein he raised a number of claims, including that (1) Schlup was actually innocent of the murder, and that his execution would therefore violate the Eighth and Fourteenth Amendments, (2) trial counsel was ineffective for failing to interview alibi witnesses; and (3) the State had failed to disclose critical exculpatory evidence. Schlup, 513 U.S. at 307. The petition was supported by numerous affidavits from inmates attesting to Schlup's innocence.

On August 23, 1993, without holding a hearing, the District Court dismissed Schlup's second habeas petition, concluding that Schlup's various filings did not provide adequate cause for failing to raise his new claims more promptly. Schlup, 513 U.S. at

309. Moreover, the court concluded that Schlup had failed to meet the <u>Sawyer v. Whitley</u>, 505 U.S. 333 (1992), standard for showing that a refusal to entertain those claims would result in a fundamental miscarriage of justice. <u>Schlup</u>, 513 U.S. at 309.

The court of appeals issued two decisions, both of which denied the petition. On October 15, 1993, in an opinion that was subsequently vacated, the Court of Appeals held that petitioner's claim of innocence was governed by the standard announced in <u>Sawyer</u>, and it concluded that under that standard, the evidence of Schlup's guilt that had been adduced at trial foreclosed consideration of petitioner's current constitutional claims. <u>Schlup</u>, 513 U.S. at 311. On November 15, 1993, the Court of Appeals vacated its earlier opinion and substituted a more comprehensive analysis of the law to support its decision to deny Schlup's request for a stay. The majority adhered to its earlier conclusion that <u>Sawyer</u> stated the appropriate standard for evaluating Schlup's claim of actual innocence. <u>Schlup</u>, 513 U.S. at 314.

For purposes of the case at bar, the Schlup Court's handling of the procedural default argument is important. First, the Court distinguished Schlup's claim of actual innocence from that presented in <u>Herrera v. Collins</u>, 506 U.S. 390 (1993), noting that unlike Herrera, Schlup's claim of innocence was procedural, rather than substantive; his constitutional claims were based not on his innocence, but rather on his contention that the ineffectiveness of his counsel, pursuant to <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), and the withholding of evidence by the prosecution, in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), "denied him the full panoply of protections afforded to criminal defendants by the Constitution."  <u>Schlup</u>, 513 U.S. at 314.

Critically, with regard to the issue of cause and prejudice, the Court observed that Schlup could proceed with his claim, despite his inability to establish "cause and prejudice" if he fell in the narrow class of cases demonstrating a fundamental miscarriage of justice:

> Schlup, however, faces procedural obstacles that he must overcome before a federal court may address the merits of those constitutional claims. Because Schlup has been unable to establish "cause and prejudice" sufficient to excuse his failure to present his evidence in support of his first federal petition, see McCleskey v. Zant, 499 U.S. 467, 493-494 (1991), Schlup may obtain review of his constitutional claims only if he falls within the "narrow class of cases ... implicating a fundamental miscarriage of justice," id., at 494, Schlup's claim of innocence is offered only to bring him within this "narrow class of cases."

Schlup, 513 U.S. at 314-15.[4]  Importantly, the Court also observed that "Schlup's claim of innocence is thus 'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'" Schlup, 513 U.S. at 315, quoting Herrera, 506 U.S. at 404.

The Court further observed:

> Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim. *However, if a petitioner such as Schlup presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims.*

Schlup, 513 U.S. at 315.

For purposes of this case, the discussion of the actual innocence exception to "cause and prejudice" in Schlup forecloses the government's argument that Goldman

---

[4] Schlup argued in the district court that the lack of diligence of his appointed postconviction counsel, coupled with problems created by the state, established cause and prejudice. That argument was rejected by the District Court and the Court of Appeals, and he did not renew it in the Supreme Court. Schlup, 513 U.S. at 515, n.29.

must satisfy cause and prejudice to proceed with his claim of actual innocence. Indeed, the Schlup Court's later analysis of a trio of 1986 decisions—Kuhlmann v. Wilson, 477 U.S. 436 (1986), Murray v. Carrier, 477 U.S. 478 (1986), and Smith v. Murray, 477 U.S. 527 (1986)—that informed its analysis underscores the fact that a petitioner asserting actual innocence need not satisfy the cause and prejudice standard. In Carrier, Justice O'Connor observed that the Court had adopted the cause and prejudice standard in part because of its confidence that that standard would provide adequate protection to "'victims of a fundamental miscarriage of justice,'" but that the Court has candidly refused to "pretend that this will always be true," Carrier, 477 U.S. at 496. For that reason, the Court held in Carrier, "'[i]n appropriate cases,' the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration . . . Accordingly, we think that in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." Schlup, 513 U.S. at 320-21, quoting Carrier, 477 U.S. at 495-496. In Schlup, the Court noted that "[i]n subsequent cases, we have consistently reaffirmed the existence and importance of the exception for fundamental miscarriages of justice." Schlup, 513 U.S. at 321, citing Sawyer, 505 U.S. at 339-340; McCleskey, 499 U.S. at 494-95 ("To excuse his failure to raise the claim earlier, [a petitioner] must show cause for failing to raise it and prejudice therefrom as those concepts have been defined in our procedural default decisions . . . If petitioner cannot show cause, the failure to raise the claim in an earlier petition may nonetheless be excused if he or she can show that a fundamental miscarriage of justice

would result from a failure to entertain the claim"); Dugger v. Adams, 489 U.S. 401, 414 NEED YEAR (Blackmun, J., dissenting); see also Bousley v. United States, 523 U.S. 614, 622 (1997) (holding that "[w]here a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent,'").  "Explicitly tying the miscarriage of justice exception to innocence thus accommodates both the systemic interests in finality, comity, and conservation of judicial resources, and the overriding individual interest in doing justice in the 'extraordinary case'."  Schlup, 513 U.S. at 322, quoting Carrier, 477 U.S. at 496.

Here, Goldman has asserted his actual innocence of the Bristol County conviction, that he was denied his statutory right to an appeal of the state court conviction and his constitutional right to the effective assistance of counsel in that state appeal, and that he was and is actually innocent of being a career offender.  The government does not dispute that without the Bristol County conviction, Mr. Goldman is actually innocent of being a career offender.  As such, given the assertion of actual innocence in the Bristol County matter, and the undisputed proposition that without said conviction Mr. Goldman is actually innocent of being a career offender, it would be a fundamental miscarriage of justice to deny Mr. Goldman the opportunity to demonstrate his actual innocence.  In short, given the claims of actual innocence, Mr. Goldman need not establish cause and prejudice for any alleged failure to previously raise these claims.

V.     **"Cause and prejudice" does not apply to claims based on post-appeal vacatur of qualifying state conviction**

In addition to the foregoing, because Mr. Goldman could not have raised the claim that he was actually innocent of being a career offender on direct appeal, he need

14

not establish "cause and prejudice." At the time of Mr. Goldman's direct appeal, the

Bristol County conviction remained intact and there therefore existed a qualifying

predicate conviction. Existing case law at the time of Mr. Goldman's appeal precluded

him from litigating on direct appeal the validity or merits of his underlying conviction,

*i.e.*, his actual innocence of the predicate offense. On January 25, 1994, in <u>United States

v. Isaacs</u>, 14 F.3d 106, 111 (1st Cir.1994), the First Circuit ruled that state court

convictions utilized to enhance federal sentences based upon the Guidelines could not be

attacked at sentencing unless the prior conviction was "presumptively void." Mr.

Goldman's appeal of his underlying federal conviction was resolved after <u>Isaacs</u>.

Additionally, PACER indicates that Mr. Goldman's statement of issues were not filed

until February 18, 1994, *i.e.*, after <u>Isaacs</u> was decided, and his brief was not filed until

March 8, 1994, well after <u>Isaacs</u> had been decided. As such, Mr. Goldman could not have

raised the legal infirmity of the predicate conviction, or his actual innocence thereof, in

his direct appeal to the First Circuit.

In <u>Isaacs</u>, the government argued, and the First Circuit agreed, that the Sentencing

Guidelines do not provide a sentencing court independent authority to permit a collateral

challenge to the constitutionality of a prior conviction where the prior conviction is being

used to compute a defendant's Criminal History Category. <u>Isaacs</u>, 14 F.3d at 108.

Relying on a revision to the pertinent Guideline section, namely Comment 6 to §4A1.2,

the Court ruled that the Commission intended to preclude collateral review of prior

convictions. <u>Isaacs</u>, 14 F.3d at 109; <u>see</u> U.S.S.G. §4A1.2, comment (n.6) (Nov. 1, 1991).

The court then ruled that the Constitution allowed challenges based on "presumptively

void" convictions, which it defined as convictions that were facially invalid or an

allegation of a "structural error." Isaacs, 14 F.3d at 112; see Sullivan v. Louisiana, 508

U.S. 275, 113 S.Ct. 2078, 2082, 124 L.Ed.2d 182 (1993) (erroneous jury instruction on

reasonable doubt is structural error); see also Arizona v. Fulminante, 499 U.S. 279, 309,

111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991) (opinion of Rehnquist, C.J., for the Court)

(listing as examples of errors that are not subject to harmless error analysis: total

deprivation of the right to counsel at trial; judicial bias; unlawful exclusion of members

of the defendant's race from a grand jury; deprivation of the right to self-representation at

trial; and deprivation of the right to a public trial). Mr. Goldman's assertion of actual

innocence to the predicate conviction was not "presumptively void," but instead required

resolution of factual issues (as contrasted with being facially void).

Of course, several months later, the Supreme Court restricted Isaacs even further,

holding in Custis v. United States, 511 U.S. 485, 114 S.Ct. 1732, 128 L.Ed.2d 517

(1994), that a defendant could not collaterally attack state court convictions during

sentencing hearings except for convictions obtained in violation of a defendant's right to

counsel. See United States v. Munoz, 36 F.3d 1229, 1237 (1st Cir.1994) (noting impact of

Custis on holding of Isaacs). Rather, the Court ruled that if Custis was successful in

attacking the state convictions in some other forum, such as through appropriate state

post-conviction procedures or federal habeas review, "he may then apply for reopening of

any federal sentence enhanced by the state sentences." Custis, 511 U.S. at 497. Then, in

Daniels v. United States, 532 U.S. 374, 121 S.Ct. 1578, 149 L.Ed.2d 590 (2001), the

Court held that "a federal prisoner may not attack a predicate state conviction through a

§2255 motion challenging an enhanced federal sentence." Daniels, 532 U.S. at 376, 121

S.Ct. 1578. Rather, the Supreme Court held, such an attack could only be made in the

state court system. <u>See</u> <u>United States v. Johnson</u>, 544 U.S. 295, 304, 125 S.Ct. 1571, 1578 (2005).

When a defendant is lawfully precluded from bringing a claim on appeal, there is no procedural default and no cause and prejudice requirement. For example, the Supreme Court has ruled that a failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under §2255. <u>Massaro</u>, 538 U.S. at 507-509. In <u>Massaro</u>, the Supreme Court sided with the 10 Federal Courts of Appeals, including the First Circuit, that had taken the position that there is no procedural default for failure to raise an ineffective-assistance claim on direct appeal. <u>See</u> <u>Massaro</u>, 538 U.S. at 503, <u>citing</u> <u>United States v. Cofske</u>, 157 F.3d 1, 2 (1st Cir.1998) (noting that defendant's claim of ineffective assistance of counsel "is not cognizable in this direct appeal" and if "defendant believes that he has a viable claim, he may raise it in a motion under 28 U.S.C. §2255"), <u>cert</u>. <u>denied</u>, 526 U.S. 1059, 119 S.Ct. 1374, 143 L.Ed.2d 533 (1999).

At the time Mr. Goldman's appeal was briefed and argued, the First Circuit had already rejected his right to litigate the propriety of his predicate "career offender" convictions in the sentencing court. As such, there was no procedural default in his failure to litigate either his claim of actual innocence of being a career offender or his claim of being actually innocent of the underlying predicate state conviction on direct appeal. Wherefore, there was no procedural default in this case and there is therefore no need to satisfy the "cause and prejudice" standards invoked by the government.

VI.    **Even if cause and prejudice analysis does apply to the present claim, these hurdles are satisfied in this case.**

17

Cause exists when there is "some external impediment, such as government interference or the reasonable unavailability of the factual or legal basis for a claim." See Andiarena v. United States, 967 F.2d 715, 718 (1st Cir.1992); McCleskey v. Zant, 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). Here, the factual basis for Mr. Goldman's claims—i.e., that the predicate conviction has been vacated, was unavailable at the time of Mr. Goldman's sentencing and appeal. The Supreme Court's recent decision in Johnson v. United States, 544 U.S. 295, 125 S.Ct. 1571 (2005), confirms that the proper characterization of the "claim" in this case for purposes of establishing "cause" is the "fact" that the qualifying conviction has been vacated.  In Johnson, the Supreme Court held that a state-court vacatur is a matter of fact for purposes of the rule in the fourth paragraph of §2255, which allows inmate to file a §2255 petition within one year from "(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. §2255, ¶6. In Johnson, the Court rejected the government's argument that "facts" for purposes of the 4th paragraph were facts supporting the argument to vacate the state conviction, noting this would result in the anomaly that a defendant would potentially know those "facts" before his federal case even began, and well before the need to file a §2255 petition would arise, and would thus result in the 4th paragraph never being available to those inmates. Johnson, 544 U.S. at 304-305.  The Court ruled:

> As for the Government's proposed reading, certainly it is true that the circumstances rendering the underlying predicate conviction invalid are ultimate subjects of fact supporting the §2255 claim, in the sense that proof of those facts (or the government's failure to negate them) is necessary to vacate the prior state conviction and eliminate the ground for the federal enhancement. But this is not enough to fit the Government's position comfortably into paragraph four. The text of § 2255, ¶ 6(4), clearly links the running of the limitation period to the discovery of the

"facts supporting the claim or claims presented," but on the Government's view, the statute of limitations may begin to run (and may even expire) before the §2255 claim and its necessary predicate even exist. Prior to the federal conviction, a petitioner has no §2255 claim because he has no enhanced federal sentence to challenge; and prior to the state vacatur, which <u>Daniels</u> makes a necessary condition for relief in most cases, a petitioner cannot obtain relief under §2255. Hence, it is highly doubtful that in §2255 challenges to enhanced sentences Congress would have meant to start the period running under paragraph four on the discoverability date of facts that may have no significance under federal law for years to come and that cannot by themselves be the basis of a §2255 claim, <u>Daniels v. United States</u>, 532 U.S., at 376, 121 S.Ct. 1578.

<u>Johnson</u>, 544 U.S. 305 (parentheticals and citations omitted). The Court eventually ruled that the vacatur of the prior conviction is indeed a "fact" for purposes of the 4th paragraph:

Johnson's argument improves on the Government's proposal by pegging the limitation period to notice of the state order eliminating the predicate required for enhancement, which is almost always necessary and always sufficient for relief. We do not find his proposal vulnerable to the point made by the majority of the Court of Appeals, that an order vacating a conviction is legally expressive or operative language that may not be treated as a matter of fact within the meaning of the statute. We commonly speak of the "fact of a prior conviction," *e.g.,* <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and an order vacating a predicate conviction is spoken of as a fact just as sensibly as the order entering it. In either case, a claim of such a fact is subject to proof or disproof like any other factual issue.

<u>Johnson</u>, 544 U.S. at 306-307; <u>see id</u>. at 309 (also imposing due diligence requirement; "diligence can be shown by prompt action on the part of the petitioner as soon as he is in a position to realize that he has an interest in challenging the prior conviction with its potential to enhance the later sentence").

As the Supreme Court found in <u>Johnson</u>, the vacatur of a prior conviction can appropriately be characterized as a "fact," and it was certainly unavailable at the time of Mr. Goldman's direct appeal. Hence, there was "some external impediment," such as "the reasonable unavailability of the factual or legal basis for [the] claim" that satisfies the

"cause" requirements. Critically, there are no grounds to believe there existed some "tactical" or "intentional" decision to forgo some procedural opportunity, which normally cannot constitute cause, <u>Reed v. Ross</u>, 468 U.S. 1, 13-14, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984).

With regard to the "prejudice" prong, the actual prejudice suffered by Mr. Goldman appears to be manifest—having been wrongly sentenced as a career offender his sentence has been significantly enhanced. Without the career offender status, Mr. Goldman's sentencing range would have been 121-151 months, but he was instead sentenced to 360 months imprisonment. (PSR at ¶¶56, 78).

In <u>Derman v. United States</u>, 298 F.3d 34, 45-46 (1st Cir.2002), the First Circuit noted that, "[t]o be sure, the Supreme Court has not elaborated the precise definition of the cause and prejudice standard for all claims." <u>See</u> <u>Amadeo v. Zant</u>, 486 U.S. 214, 221, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988). The court then observed that it analyzed "the issue of prejudice based on an examination of the record as a whole," and that the inquiry "focuses on the likelihood that the jury, had it been asked the question, would have" reached a certain result. <u>Derman</u>, 298 F.3d at 46. The court has also noted that "[t]o satisfy the prejudice prong, the petitioner must show that 'there is a reasonable probability that the result of the trial would have been different.'" <u>Evicci v. Maloney</u>, 387 F.3d 37, 40 (1st Cir.2004), <u>quoting</u> <u>Strickler v. Greene</u>, 527 U.S. 263, 289, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (internal quotation marks omitted), <u>see also</u> <u>United States v. Frady</u>, 456 U.S. 152, 167-68, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

In <u>Glover v. United States</u>, 531 U.S. 198, 121 S.Ct. 696 (2001), the Supreme Court held that there is no baseline or quantifiable increase in a defendant's sentence that

must be shown to establish prejudice under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), but that a minimal increase of jail time can constitute prejudice. In Glover, the defendant filed at §2255 petition, alleging that his counsels' failure in the trial court and on appeal to press a Guideline grouping issue constituted ineffective assistance of counsel.  Glover, 531 U.S. at 201.  In rejecting the Seventh Circuit's precedent that held an increase of 6 to 21 months in a defendant's sentence was not significant enough to amount to prejudice for purposes of Strickland v. Washington, supra, the Court held that the Seventh Circuit was incorrect "to deny relief to persons attacking their sentence who might show deficient performance in counsel's failure to object to an error of law affecting the calculation of a sentence because the sentence increase does not meet some baseline standard of prejudice," observing that relevant "[a]uthority does not suggest that a minimal amount of additional time in prison cannot constitute prejudice." Glover, 531 U.S. at 203.  "Quite to the contrary," the Court held, "our jurisprudence suggests that any amount of actual jail time has Sixth Amendment significance." Glover, 531 U.S. at 203.

Transporting these concepts to the context of this case, see Lynch v. Ficco, 438 F.3d 45, 49 (1st Cir.2006) ("However, in this circuit, we have held that Strickler v. Greene, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), requires a finding that if a habeas petitioner can meet the prejudice standard needed to establish ineffective assistance under Strickland, then the prejudice standard under the 'cause and prejudice' showing to excuse a procedural default is also met"); Evicci v. Maloney, 387 F.3d at 40 ("As this court has previously held, the prejudice standards of Strickland and Strickler are essentially the same"), the prejudice in this case is manifest. If not for the career offender

designation, Mr. Goldman's sentence would have been between 121 and 151 months (absent an upward or downward departure), drastically lower than the 360 months to which he has been sentence. See Goldman's Memorandum in Reply to Government's Opposition to §2241 Petition at §III, pp.8-9. Mr. Goldman clearly satisfies the prejudice standard.

VII.    Conclusion

The evidence will establish that Mr. Goldman is actually innocent of the predicate state court conviction and actually innocent of being a career offender.  Forcing the Petitioner to serve the remainder of a sentence that was enhanced based upon a conviction for which Mr. Goldman is actually innocent—a conviction obtained at the expense of Mr. Goldman's statutory right to appeal and his constitutional right to the effective assistance of counsel during the statutory appeal---constitutes a miscarriage of justice.  As such, the Court should vacate the sentence imposed in Criminal No. 92-10229-AMD (United States v. Goldman) and re-sentence Mr. Goldman to 121 to 151 months incarceration, his guideline sentence without inclusion of the vacated predicate conviction.

Frank Goldman,
By his attorney,

**/s/ Robert M. Goldstein**
Robert M. Goldstein
Mass. Bar No. 630584
20 Park Plaza, Suite 903
Boston, MA 02116
 (617) 742-9015

Dated: March 13, 2008

## <u>CERTIFICATE OF SERVICE</u>

I, Robert M. Goldstein, hereby state that on this date, March 13, 2008, a true copy of the foregoing document has been served, via electronic filing, upon all registered parties.


**/s/ Robert M. Goldstein**
Robert M. Goldstein