UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FRANKLIN M. GOLDMAN,          )
        Petitioner         )
                         )
    v.                  )  Civil No. 04-CV-12712-MLW
                         )
DAVID L. WINN, WARDEN,      )
UNITED STATES OF AMERICA,  )
        Respondents

**Goldman's Reply to Government's Response to Memorandum Preserving Fifth Amendment Objection to Admission of Portions of Parole Records**

The government has offered several arguments in support of its proffered admission of certain portions of parole records, each of which should be rejected for the following reasons.

I.    Argument.

    A.    *Minnesota v. Murphy* does not undermine Goldman's Fifth Amendment Objection.

The government incorrectly argues that this case is more akin to *Minnesota v. Murphy*, 465 U.S. 420 (1984) than *United States v. Saechao*, 418 F.3d 1073 (9th Cir. 2005). In *Murphy*, the issue before the Court was whether the Fifth Amendment prohibited the introduction into evidence of certain admissions by Murphy to his probation officer in Murphy's subsequent criminal prosecution (for an offense different than the offense that led to the probation supervision). Murphy's terms of probation required, among other things, that he participate in a treatment program for sexual offenders, report to his probation officer as directed, and be truthful with the probation officer "in all matters." *Murphy*, 465 U.S. at 422. "Failure to comply with these

conditions, Murphy was informed, could result in his return to the sentencing court for a

probation revocation hearing." *Murphy*, 465 U.S. at 422.

First and foremost, in *Murphy*, the Court clearly held that invocation of the Fifth

Amendment privilege can be self-executing when warranted by the circumstances. While

"the general obligation to appear and answer questions truthfully did not in itself convert

Murphy's otherwise voluntary statements into compelled ones," *Murphy*, 465 U.S. at

427, because he would be in no different situation than the "ordinary case" where a

witness is called before a grand jury or at trial, *see Murphy*, 465 U.S. at 427 ("in the

ordinary case, if a witness under compulsion to testify makes disclosures instead of

claiming the privilege, the government has not 'compelled' him to incriminate himself"),

the Court acknowledged there are exceptions to this general rule. In particular, one

exception to the general rule that one must assert the privilege or lose it is when there

exists some identifiable factor that denied the individual a "free choice to admit, to deny,

or to refuse to answer," including instances where the assertion of the privilege is

penalized so as to "foreclos[e] a free choice to remain silent, and ... compe[l] ...

incriminating testimony." *Murphy*, 465 U.S. at 434, *quoting Garner v. United States*, 424

U.S. 648, 661 (1976). The Court noted that "[t]he threat of punishment for reliance on

the privilege distinguishes cases of this sort from the ordinary case in which a witness is

merely required to appear and give testimony." *Murphy*, 465 U.S. at 435.

Moreover, importantly, the Court held there need not be an express assertion of a

penalty attached to any invocation of the privilege, but merely implying such a penalty is

sufficient. As the Murphy Court observed, [t]here is thus a substantial basis in our cases

for concluding that if the state, *either expressly or by implication*, asserts that invocation

of the privilege would lead to revocation of probation, it would have created the classic

penalty situation, the failure to assert the privilege would be excused, and the

probationer's answers would be deemed compelled and inadmissible in a criminal

prosecution." *Murphy*, 465 U.S. at 435 (emphasis added).  While the government argues

there is no evidence that Mr. Goldman was forced to choose between incriminating

himself and having his parole revoked, *see* Government Response at 2, it ignores the

Murphy Court's admonition that such a penalty can be implied, rather than express.  *See*

Government Response at 2 (omitting portion of the Court's holding wherein it states that

assertion can be "either expressly or by implication").  Here, the conditions of parole

would have been reviewed with Goldman, he would have been required to sign the

conditions, and he therefore would have know that he was required to, at the very least,

be complete and truthful with his supervising probation officer.

As for the government's argument that Goldman is no different position than

Murphy, *see* Government Response at 2-4, the conditions imposed in each case are

indeed materially different.  In this case, the evidence indicates that Goldman's condition

of probation was that he was required to provide "complete and truthful information,"

subject to the possible penalty of parole revocation.  *See* Exhibit N; Transcript Dated

March 20, 2008, at pages 86-87 (Mr. Parris testifying that one potential consequence of

refusing to answer probation officer's questions was revocation of parole); at pages 48-49

(Mr. Bocon testifying that revocation of parole would be one of many possibilities if

parolee refused to answer probation officer's questions).  Requiring complete information

is a condition *in addition* to providing truthful information, otherwise the requirement of

providing "complete" information would be superfluous and would not be part of the

probation conditions.  Goldman was not simply required to provide truthful information, he was required, at the very least, to provide complete information.

As such, this case is more akin to *Saechao*.  In that case, the Ninth Circuit held that by imposing a condition of probation that required Saechao to answer all reasonable inquiries "the state of Oregon took the 'impermissible step' of 'requir[ing] [Saechao] to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent.'" *Saechao*, 418 F.3d at 1076.  The court explained its conclusion that Oregon's provision that Saechao answer "all reasonable inquiries" was "categorically different from the 'be truthful' condition in *Murphy*:

> Not only was Saechao required to be truthful to his probation officers, but he was expressly required, under penalty of revocation, to "promptly ... *answer all* reasonable inquiries." Contrary to the government's contentions, there *is* a significant difference between being required to be "truthful with ... probation officer in all matters," *Murphy,* 465 U.S. at 422 (internal quotation marks omitted), and being required to "promptly and truthfully *answer all* reasonable inquiries." Whereas the former "sa[ys] nothing about [a probationer's] freedom to decline to answer particular questions" and "proscribe[s] only false statements," the latter specifically penalizes a refusal to "answer particular questions." *Murphy*, 465 U.S. at 437.  In contrast to Murphy, who the Supreme Court found was free to remain silent as long as he was truthful when he spoke, Saechao did not have the luxury of remaining silent without violating the conditions of his probation. Failure to answer a relevant inquiry regarding the conditions of probation would have justified the revocation of his probation.

*Saechao*, 418 F.3d at 1078.  In this case, the conditions of probation did not proscribe only false statements, it also required that Mr. Goldman be complete with his supervising officer.  Even if not entirely synonymous with a requirement to answer all reasonable inquiries, a requirement to be complete and truthful is materially different than a requirement to be simply truthful.  The requirement to be complete suggests an obligation to answer all inquiries of a supervising probation officer, even if not reasonable (which was the limitation in *Saechao*). For these reasons, Goldman respectfully submits this case

is more akin to the probation terms at issue in *Saechao*, but more importantly materially

different than the terms at issue in *Murphy*, but ultimately it is a decision to be made by

the Court.[1]

B.     The First Circuit cases discussed by the government are inapposite.

The government argues that "[c]ase law suggests that the First Circuit would

require the Petitioner to invoke his privilege," citing *United States v. Davis*, 242 F.3d 49

(1st Cir.2001) and *United States v. York*, 357 F.3d 14 (1st Cir.2004) in support of this

proposition.  Both cases are inapposite.  In those cases, the defendant mounted a general

and prospective Fifth Amendment attack upon certain conditions of supervised release.

What was missing in those cases—and the scenario raised by this case—was the

government's attempt to introduce a statement in a subsequent proceeding that was

compelled by virtue of the fact that the probation officer, expressly or by implication,

asserted that failure to answer could result in revocation of parole.

In *United States v. Davis*, 242 F.3d 49 (1st Cir.2001), the issue was not whether

invocation of the privilege should be self-executing, but rather whether Davis retained the

ability to raise a general Fifth Amendment objection to a probation officer's question, at

---

[1] It should be noted that, in its analysis of *Murphy*, the government omits any mention of the Court's discussion of relevant state matters.  While the Court did conclude that Murphy's probation conditions did not go "farther" than simply requiring him to appear and give information relevant to his probationary status, *Murphy*, 465 U.S. at 436, the Court also observed that it had not been advised of any case in which Minnesota had attempted to revoke probation merely because a probationer refused to make nonimmunized disclosures concerning his own criminal conduct, and ultimately ruled that without "the benefit of an authoritative state-court construction of the condition" it was "hesitant to read into the truthfulness requirement an additional obligation that Murphy refrain from raising legitimate objections to furnishing information that might lead to his conviction for another crime." *Murphy*, 465 U.S. at 436-40.  This Court is not confined by any such limitations.  The Ninth Circuit discussed these limitations in distinguishing its case from Murphy.  *See Saechao*, 418 F.3d at 1078 (court noting that "[i]n light of the limitations of Murphy's probation condition, and the state's subsequent insistence that 'it would not, and legally could not,' on the basis of a 'be truthful' condition, 'revoke probation for refusing to answer questions calling for information that would incriminate in separate criminal proceedings,' the court concluded that Murphy could not have been objectively or subjectively 'deterred from claiming the privilege by a reasonably perceived threat of revocation.'").

some future time, without having his supervised release revoked. *See Davis*, 242 F.3d at 51 (in rejecting the government's motion to summarily dismiss on ripeness grounds, court noting that Davis "reasonably seeks to determine whether exercising his Fifth Amendment privilege in response to questions by his probation officer will result in revocation of his supervised release," and therefore, "[a]s limited by Davis, his challenge to the district court's imposition of the special condition is ripe for review.").[2]  In rejecting Davis' claim, the court reiterated that the "Supreme Court's 'decisions have made clear that the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege,'" *Davis*, 242 F.3d at 51, *quoting Murphy*, 465 U.S. at 438, and concluded that the district court's statements at sentencing could *not* be construed *only* to mean that revocation of supervised release would result from invocation of the privilege, *Id*. ("Although the district court's comments at sentencing might possibly be interpreted to contain such a threat, that is not their only reasonable interpretation.")  The First Circuit specifically noted that "[s]hould the court revoke Davis's supervised release as a penalty for his legitimate exercise of his Fifth Amendment privilege, he remains free to challenge that action at the time it occurs." "For now," the court concluded, "we must focus on the challenged special condition itself. We do not find that condition, even as explained by the district court, to carry a realistic threat of such a penalty." *Davis*, 242 F.3d at 52.

Likewise, in *United States v. York*, 357 F.3d 14 (1st Cir.2004), which again concerned a generalized Fifth Amendment attack upon a supervised release condition

---

[2] In *Davis*, the defendant had not moved to suppress particularized statements he contended were obtained in violation of his Fifth Amendment rights. *See* Government Response at 5 (acknowledging that the "probation officer had not yet asked the questions, and the defendant had not yet invoked the Fifth Amendment").

6

(this time, a requirement that the defendant submit to periodic polygraph testing), the court noted that "[o]f course, York will have a valid Fifth Amendment claim if his probation officers ask, and compel him to answer over his assertion of privilege, a particular question implicating him in 'a crime other than that for which he has been convicted.'" *York*, 357 F.3d at 24, *citing Murphy*, 465 U.S. at 426. The court ruled, however, that "York cannot mount a generalized Fifth Amendment attack on the conditions of his supervised release on the ground that he will be required to answer probation officers' questions truthfully." *York*, 357 F.3d at 24. In addressing the resulting question—whether the requirement that York submit to polygraph tests during these interviews alters the constitutional analysis—the court ultimately ruled that the district court's condition, and its subsequent directive that the defendant did not give up his Fifth Amendment rights when submitting to a polygraph exam, was susceptible to three different interpretations, but the "most sensible interpretation" was that York's supervised release would not be revoked based on his refusal to answer polygraph questions on valid Fifth Amendment grounds. *York*, 357 F.3d at 25.[3] Concluding that "[u]nder *Murphy,* if York can assert his Fifth Amendment privilege without risking revocation, he does not face a 'classic penalty situation,' and his answers will not be considered 'compelled' within the meaning of the Fifth Amendment unless he is forced to answer over his valid assertion of privilege," *York*, 357 F.3d at 25, the court construed the district court order "to provide that York's supervised release shall not be revoked based on his valid assertion of Fifth Amendment privilege during a polygraph

---

[3] The two other potential interpretations, as elucidated by the First Circuit, were (1) that York must answer every question during his polygraph exams on pain of revocation, but that his answers will not be used against him in any future prosecution or (2) that York will be entitled, in any future prosecution, to seek exclusion of his answers on the grounds that the polygraph procedure forced him to incriminate himself.

examination" and York's sentence, including the special conditions of supervised release, were valid. *York*, 357 F.3d at 25.

Unlike this case, there were no particular statements at issue in either of the cases cited by the government, because no statements had yet been extracted from either York or Davis; instead, they mounted a prospective Fifth Amendment attack on their conditions of release, before they ever faced a classic penalty scenario. Clearly, then, the First Circuit did not address whether any invocation of the privilege should be self-executing, and/or whether statements were compelled as a result of either an express or implied assertion of revocation for failure to answer. For these reasons, the cases are not persuasive.[4]

C.     *Schlup v. Delo* is a separate and independent inquiry.

In pressing for the admission of the contested portions of the parole records, the government seizes upon the Court's discussion of *Schlup v. Delo*, 513 U.S. 298, 327 (1995), and the Supreme Court's admonition in that case that district courts are not bound by rules of admissibility in addressing claims of actual innocence. This is an inquiry separate and independent of the Fifth Amendment issue. In essence, the government argues that even if the statements were compelled in violation of the Fifth Amendment,

---

[4] Moreover, the questions asked of Goldman did have the potential of incriminating Goldman. *Cf* Government Response at 8 ("There is nothing in the record to indicate that the Petitioner asserted his privilege, and in any event, the nature of the employment statements themselves do not call for incriminating responses and do not suggest he had implicated himself in any crime"). Certain questions regarding Goldman's employment status were surely posited to Goldman either at the request of the state police detective investigating the Lopes kidnapping or were related to that investigation, as the investigator had asked the probation officer to contact Mr. Goldman's employer to determine if he had been working there on the date in question. In any event, questions likely to elicit answers regarding Goldman's whereabouts on the date of the Lopes kidnapping had the potential to incriminate Goldman, irrespective of whether Goldman was actually innocent of the Bristol offenses.

the Court should still consider them in assessing Goldman's claim of actual innocence. Goldman offers several points on this separate contention.

First, in *Schlup*, the Court specifically noted that the reliability of any such evidence remains a critical consideration. *Schlup*, 513 U.S. at 327-28. In particular, the Court stated that "with respect to this aspect of the *Carrier* standard, we believe that Judge Friendly's description of the inquiry is appropriate: The habeas court must make its determination concerning the petitioner's innocence 'in light of all the evidence, including that alleged to have been illegally admitted (*but with due regard to any unreliability of it*) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.'" *Schlup*, 513 U.S. at 328 (emphasis added). Hence, even if permitted to consider evidence obtained in violation of the Fifth Amendment, a touchstone of that inquiry is the reliability *vel non* of the proposed evidence.

Here, the statements at issue are certainly unreliable. First, statements compelled in violation of the Fifth Amendment are inherently unreliable. Moreover, the document at issue—the parole chronology notes—were located within an incomplete probation file, which was approximately 30 years old at the time the government secured the record from Probation. They are *notes* of interviews prepared by the probation officer— prepared without any certitude they would ever be relied upon by a Court. No witness with knowledge of the statements contained within the chronology notes was offered by the government. While Mr. Bocon and Mr. Parris testified regarding ordinary practices, there is no evidentiary basis to conclude that those ordinary practices were definitively followed in this case. Even if they were followed, it is certainly possible there was a

mistake in transposing the defendant's alleged statements into writing.[5]  Even if

accurately transposed, there is certainly the risk that Mr. Goldman was not being entirely

forthright with his probation officer at the time, for whatever his reasons might have been

at that time—*i.e.*, perhaps he was working with a convicted felon at Budweiser, in

violation of his conditions of probation, and did not want his probation officer to forbid

him from working there and concomitantly earning a living.[6]

       Perhaps more importantly, though, the statements do not possess the evidentiary

significance attributed by the government.  The running parole notes reflect statements by

Mr. Zalkind, during the relevant time period, that Mr. Goldman was fired from his

previous job on the date in question and went to Cambridge on the very morning of the

alleged Lopes kidnapping to apply for a job at Budweiser.  This would have made it

impossible for Mr. Goldman to have participated in the alleged Lopes kidnapping, and

Mr. Zalkind would have been foolish to make such an assertion at the time if not entirely

accurate, as the probation officer could easily verify such information during the relevant

time period.  According to the parole notes, the first part of Mr. Zalkind's statement is

corroborated by Mr. Goldman's former boss, who told the probation officer that Mr.

Goldman showed up for work--in Malden, Massachusetts-- on the morning of the

---

[5] One must consider that in the moment that the probation officer transposed her notes into the report (whether a day or week after the interview), whether by distraction or otherwise, the probation officer could have mistakenly wrote that Mr. Goldman began working at Budweiser "after" thanksgiving, rather than before Thanksgiving.  Certainly, the probation officer did not know that the government would be attributing such significance to the statement more than thirty years later, and would have had no extra incentive to ensure the accuracy of that part of her report.

[6] Of course, even assuming *arguendo* the parole record is an accurate recitation of Mr. Goldman's actual statement (a point not conceded by Goldman), clearly Mr. Goldman could have been mistaken if he asserted he began at Budweiser after Thanksgiving, rather than right before Thanksgiving.  The question was apparently asked in January 1976, more than a month after the event in question, and the actual start date at Budweiser would have largely been an immaterial fact in Goldman's mind because he was actually innocent of the Lopes kidnapping and would have possessed no incentive to accurately recite that he began working there a few days before Thanksgiving, rather than a few days thereafter.  In any event, as discussed *infra*, the statement at issue hardly possesses the evidentiary significance offered by the government.

kidnapping, and was terminated that morning.  Given the fact that the police reports indicate that the three alleged kidnappers were observed outside the Café at approximately 7:30 a.m. on the morning of the robbery (*i.e.*, Larkin, Mondello and DeLeo), it would have been impossible for Mr. Goldman to be at the Café at 7:30 a.m.. In short, the parole notes overwhelmingly support his claim of actual innocence.

Finally, Mr. Goldman's employment at Budweiser on the date of the alleged kidnapping is a red herring in this matter—the issue is whether he participated in the alleged kidnapping, not whether he was working at Budweiser, and the evidence has conclusively established that he did not participate in the kidnapping.  Indeed, the government's reliance upon this statement as evidence that Goldman did not sustain his burden of proof compellingly illuminates the government's failure to undermine Goldman's central contention—that he is actually innocent of the relevant Bristol County offenses.  The government has had more than four years to investigate Goldman's claim of actual innocence of the relevant state offenses (the instant petition having been filed on December 27, 2004).  Mr. Mondello's affidavit was attached to the original pleading, as was an affidavit from Attorney Zalkind.  After more than four years to investigate these claims, to interview Mr. Mondello, Mr. Zalkind, Mr. O'Boy or any other potential witness, to thoroughly cross-examine these witnesses in open court, with the benefit of having Mr. DeLeo's deposition testimony weeks before the trial in this case and the opportunity to cross-examine him on two occasions, the government clings to a few unreliable statements unearthed from a dusty probation file on the eve of trial.  This, as well as anything else, demonstrates that Goldman has overwhelmingly proven his actual innocence of the relevant offenses.

II.    Conclusion

For all of the foregoing reasons, as well as the fact that neither the government nor the defendant have found any case directly holding that the Fifth Amendment's prohibition against use of involuntary, compelled statements in a criminal case does not apply to habeas actions, Goldman seeks to preserve his Fifth Amendment objection to the admission of the portions of the parole records at issue.

Frank Goldman,
By his attorney,

**/s/ Robert M. Goldstein**
Robert M. Goldstein
Mass. Bar No. 630584
20 Park Plaza, Suite 903
Boston, MA 02116
(617) 742-9015

Dated: April 18, 2008

<b>CERTIFICATE OF SERVICE</b>

I, Robert M. Goldstein, hereby state that on this date, April 18, 2008, a true copy of the foregoing document has been served, via electronic filing, upon all registered parties.

**/s/ Robert M. Goldstein**
Robert M. Goldstein